# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

## CIVIL NO. _____

_____

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **NATIONWIDE CREDIT SERVICES, INC.,** | ) |
| a Florida corporation; | ) |
| | ) |
| and | ) |
| | ) |
| **JAMES R. DOOLEY, individually and as** | ) |
| president of Nationwide Credit Services, Inc., | ) |
| | ) |
| **Defendants** | ) |

_____)

# PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

# TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        Plaintiff, the **Federal Trade Commission** . . . . . . . . . . . . . . . . . . . . . . . . 2
        Defendant **Nationwide Credit Services, Inc.** . . . . . . . . . . . . . . . . . . . . . . 3
        Defendant **James R. Dooley** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.    BACKGROUND ON THE CREDIT REPORTING SYSTEM
        AND CREDIT REPAIR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.     DEFENDANTS' BUSINESS PRACTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

V.      THE COURT IS AUTHORIZED TO GRANT THE RELIEF REQUESTED . . . . . 10

VI.     ENTRY OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY
        INJUNCTION IS APPROPRIATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        A.      The FTC Has Demonstrated a Likelihood of
                Success on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
                1.      Defendants have violated Section 5 of the FTC Act
                        Count III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
                2.      Defendants have violated the Credit Repair Organizations Act
                        Counts I and II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        B.      The Balance of Equities Mandates Temporary
                and Preliminary Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VII.    DEFENDANT JAMES R. DOOLEY IS INDIVIDUALLY LIABLE . . . . . . . . . . . 18

VIII.   A TRO INCLUDING INJUNCTIVE RELIEF, AN ASSET FREEZE, AND
        IMMEDIATE PRODUCTION OF DOCUMENTS IS NECESSARY . . . . . . . . . . 20

IX.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

<u>**CASES**</u> <u>**PAGES**</u>

*CFTC v. Hunt*, 591 F. 2d 1211 (7th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Fed. Sav. & Loan Ins. Corp. v. Sahni*, 868 F. 2d 1096 (9th Cir. 1989) . . . . . . . . . . . . . . . 21

*FTC v. Affordable Media, L.L.C.*, 179 F. 3d 1228, 1233 (9th Cir. 1999) . . . . . . . . . . . . . . 13

*FTC v. Amy Travel Serv. Inc.*, 875 F. 2d 564 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . 11, 12, 18

*FTC v. Atlantex Assoc.*, 1987-2 Trade Cas. (CCH) ¶ 67,788, 59,252
    (S.D. Fla. 1987), aff'd, 872 F. 2d 966 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . 18

*FTC v. Bad Credit Be Gone*, No. 1:06-cv-00254 (E.D. Ill. Jan. 2006) . . . . . . . . . . . . . . . 12

*FTC v. Debt Management Foundation Services,* No. 8:04-cv-1674-T-17MSS
    (M.D. Fla. Jul.20, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*FTC v. Elders Grain, Inc.* 868 F. 2d 901, 907 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 11

*FTC v. FTN Promotions, Inc.*, No. 8:07-cv-1279-T-3OTGW (M.D. Fla. Jul.23, 2007) . . . . 12

*FTC v. Gem Merchandising Corp.*, 87 F. 3d 466 (11th Cir. 1996)) . . . . . . . . . . . . . . 11, 12

*FTC v. Gill*, 71 F. Supp. 2d 1030 (C.D. Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*FTC v. Gregory Bryant, Jr.*, No. 3:04-cv-897-J-32MMH
    (M.D. Fla. Sept.16, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*FTC v. Global Mktg. Group, Inc.*, No. 8:06-cv-2272-30TGW
    (M.D. Fla. Dec.12, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*FTC v. H. N. Singer, Inc.*, 668 F. 2d 1107 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . 11, 12, 20

*FTC v. Jordan Ashley, Inc.*, 1994-1 Trade Cas. (CCH)
    ¶ 70,570 (S.D. Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282 (D. Minn. 1985) . . . . . . . . . . . . . . . . . . . . 18

*FTC v. Mortgage Foreclosure Solutions*, No. 8:08-cv-00388-T-23EAJ
    (M.D. Fla. Feb. 27, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*FTC v. Pantron I Corp.*, 33 F. 3d 1088, 1095 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . 14

*FTC v. Para-Link Int'l, Inc.*, 2000 U.S. Dist. LEXIS
    21509 (M.D. Fla. Nov. 21, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*FTC v. Payneless Credit Repair, LLC*, No.3:08-cv-1160-M
    (N.D. Tex. July 10, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*FTC v. Rudolph Joseph Strobel*, No. 2:08-CV-326
    (E.D. Tex. August 28, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*FTC v. Thomas Gregg Holloway*, No. 3:02-cv-343-J20TEM
    (M.D. Fla. Apr.12, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*FTC v. Southwest Sunsites, Inc.*, 665 F. 2d 711 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . 12, 18

*FTC v. United Home Savers, LLP,* No. 8:08-cv-1735-T-33TBM
    (M.D. Fla. Sept. 4, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984) . . . . . . . . . . . . . . . . . 11,12, 20

*FTC v. Warner Communs., Inc.*, 742 F. 2d 1156 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . 13

*FTC v. World Travel Vacation Brokers*,
    861 F. 2d 1020 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 17,18

## **STATUTES**

Federal Trade Commission Act

    15 U.S.C. § 45(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,14

    15 U.S.C. § 53(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,10

    15 U.S.C. § 57b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Credit Repair Organizations Act, 15 U.S.C. §1679h(a) . . . . . . . . . . . . . . . . . . . . . . . .1, 2, 16

Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681  . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## I.    INTRODUCTION

Plaintiff Federal Trade Commission ("FTC") having filed its Complaint for Injunctive and Other Equitable Relief, moves this Court, pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b) and 57b, Section 410(b) of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679h(b), and Rule 65(b) of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 65(b), for a temporary restraining order ("TRO") to halt Defendants' fraudulent credit repair business practices.[1]

Since 2004, Defendants Nationwide Credit Services, Inc. ("NCS") and its owner, James R. Dooley ("Dooley"), have engaged in an illegal credit repair operation that deceives consumers into believing that Defendants can and will permanently and legally remove all negative information from the consumers' credit reports, even information that is accurate and not obsolete.  Defendants charge consumers an initial down payment typically ranging from $75 to $150 in advance of performing any credit repair services.  After paying Defendants hundreds of dollars or more, Defendants rarely, if ever, deliver the promised results.  In fact, in many instances, Defendants take consumers' money without providing any services whatsoever.  Defendants' deceptive practices not only violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) and CROA, 15 U.S.C. §§ 1679-1679j, but also cause substantial injury to consumers experiencing financial difficulties who can least afford to lose their money.

Accordingly, Plaintiff respectfully moves, pursuant to Fed. R. Civ. P. 65, for the

---

[1]    The relevant statutory provisions cited herein are provided in Volume III.

issuance of a TRO that: 1) enjoins Defendants' deceptive practices; 2) freezes Defendants' assets; and 3) provides for immediate production of specific documents, including the completed Financial Statements appended to the proposed TRO.  The TRO also requires Defendants to show cause why a preliminary injunction should not issue.  Such relief is critical to immediately halt Defendants' deceptive conduct, preserve the *status quo*, and preserve any unlawfully obtained assets pending final resolution of this matter.

The FTC's Motion for TRO is supported by substantial and compelling evidence including: copies of the Defendants' advertising and promotional materials; 11 consumer declarations detailing their experiences with Defendants; a declaration of a former NCS manager; an undercover tape recording of Defendants' credit repair sales pitch; a Better Business Bureau ("BBB") declaration discussing consumer complaints received; and declarations from two credit reporting agencies explaining why Defendants' credit repair scheme cannot produce the promised results.[2]

## II.    THE PARTIES

### A.    <u>The Federal Trade Commission</u>

Plaintiff FTC is an independent agency of the United States Government created by the FTC Act, 15 U.S.C. § 41 *et seq.*  The FTC is charged, *inter alia*, with enforcing Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also is charged with enforcing the Credit Repair Organizations Act, 15 U.S.C. §1679h(a), which provides the FTC with the authority to

---

[2]    References to documents included in Exhibits filed in support of this Memorandum are made to the Exhibit followed by the paragraph or page number, if applicable (*e.g.*, Ex. 1, ¶ 29).

enforce the provisions of CROA in the same manner as it enforces the FTC Act.[3]  The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and CROA in order to secure such equitable relief as is appropriate in each case, including, but not limited to, rescission of contracts and restitution, and the disgorgement of ill-gotten gains by Defendants restitution for injured consumers.[4]

**B.**     **The Defendants**

     **1.**     **Nationwide Credit Services, Inc.**

Nationwide Credit Services, Inc., a closely-held corporation, was incorporated in the state of Florida in November 2003 and has its principal place of business as 8535-6A Baymeadows Road in Jacksonville, Florida 32256.[5]  NCS is a "credit repair organization," as that term is defined in Section 403(3) of CROA, 15 U.S.C. § 1679a(3).[6]  Defendants' business has produced numerous consumer complaints filed with FTC and the BBB.[7]

---

[3]     Sections 410(a) - (b), 15 U.S.C. §§ 1679h(a) and (b).

[4]     15 U.S.C. §§ 53(b), 57b, and 1679h(b).

[5]     Ex. 1 [Liggins] ¶ 6, Att. A.

[6]     CROA defines a "credit repair organization" to mean "any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of . . . improving any consumer's credit record, credit history, or credit rating[.]" 15 U.S.C. § 1679a(3).

[7]     Ex. 1 [Liggins] ¶¶ 10-11, Att. F; Ex. 3 [Stephens] ¶¶ 7-11, Att. B.

### 2.    James R. Dooley

James R. Dooley, also know as Jamie Dooley, resides in Jacksonville, Florida.[8] Dooley is the president of NCS and its registered agent.[9] Dooley directs and controls the business operations of NCS.[10] Acting alone or in concert with others, Dooley has formulated, directed, controlled, or participated in the unlawful acts set forth in the Complaint.

### III. BACKGROUND ON THE CREDIT REPORTING SYSTEM AND CREDIT REPAIR

Information about consumers' credit histories is regularly collected by credit reporting agencies (also know as credit bureaus) and compiled into consumer credit reports.[11] These reports contain payment histories and items of public record, such as judgments, tax liens, and bankruptcy filings. The Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, requires credit reporting agencies to adopt reasonable procedures to ensure the accuracy, fairness, confidentiality, relevancy, and proper utilization of consumer credit information. The FCRA specifies the reporting time frame of such information, and in the event of reporting errors, provides a mechanism for disputes.[12] Accurate negative information can typically be reported on consumers' credit reports for up to seven years, and

---

[8]     Ex. 1 [Liggins] Att. I, p. 7.

[9]     Ex. 1 [Liggins] ¶ 6, Att. A.

[10]    *See infra* Part VII.

[11]    15 U.S.C. § 1681b.

[12]    15 U.S.C. §§ 1681c, 1681i. *See also*, Ex. 4 [TransUnion] ¶4; Ex. 5 [Experian] ¶ 3.

up to ten years for bankruptcies.[13]  Obsolete information that may no longer be reported is deleted.[14]  Credit reporting agencies must, upon request, verify the accuracy of the data reported to them.  Information that cannot be verified with the creditor that initially reported it is deleted, whereas information that is verified as accurate remains reported on the consumers' credit reports.  If consumers can show that negative information is inaccurate, the credit report is corrected.[15]  This service is provided free of charge.[16]

Credit repair scam operators often claim to have specialized knowledge of the credit reporting system and laws that enables them to have truthful information that is not obsolete removed from consumers' credit reports.  Consumers with bad credit are often desperate for a quick fix to regain creditworthiness.  Armed with this knowledge, credit repair schemers often target these particular consumers and mislead them into paying hundreds of dollars for promised credit repair services that can rarely, if ever, be delivered.[17]

## IV.    DEFENDANTS' BUSINESS PRACTICES

Since at least March 2004,[18] Defendants have operated a credit repair scam in which

---

[13]    15 U.S.C. § 1681i.  *See also*, Ex. 4 [TransUnion] ¶4; Ex. 5 [Experian] ¶ 3.

[14]    Ex. 4 [TransUnion] ¶4; Ex. 5 [Experian] ¶ 3.

[15]    *See generally* 15 U.S.C. § 1681c(a), 1681i(a)(5).  *See also*, Ex. 4 [TransUnion] ¶ 6; Ex. 5 [Experian] ¶ 8.

[16]    15 U.S.C. § 1681i(a)(1)(A).

[17]    The FTC has a long history dealing with credit repair scams like Defendants' business.  The FTC publishes educational materials warning consumers to be weary of credit repair companies.  *See, e.g.*, "Credit Repair: Self-Help May Be Best," at www.ftc.gov/bcp/conline/pubs/credit/repair.shtm.  To rein in corrupt credit repair organizations, Congress passed CROA in 1997.  *See* 15 U.S.C. § 1679(b).

[18]    Ex. 1 [Liggins] Att. F, p. 1.

they mislead consumers through advertisements, promotional materials, and oral misrepresentations that current[19] and accurate negative information can be deleted from consumers' credit reports.[20] Defendants require consumers to pay "down payment" or advance fee for purported credit repair services that are rarely, if ever, performed.[21] After paying hundreds of dollars or more, consumers ultimately discover that Defendants' claims to remove negative credit are false.[22]

Defendants have advertised and continue to advertise their credit repair services through a variety of means such as Internet website and radio advertisements, signs, and local and online Yellow Pages listings.[23] To induce consumers to purchase their services, Defendants advertise on the home page of the Internet website www.ehappyhour.com:

**ERASE BAD CREDIT!**
731-1333
Nationwide Credit Services, Inc.

---

[19]     The terms "current" and "not obsolete" negative information are use interchangeably herein. CROA § 404(a)(2) uses the term "information that is accurate and *not obsolete*" and § 405(a) uses the term "accurate, *current*, and verifiable information" to refer to reported credit information that cannot be removed from consumers' credit reports (emphasis supplied).

[20]     Ex. 6 [Bethea] ¶ 8; Ex. 8 [Hendrix] ¶ 5; Ex. 9 [Johnstone] ¶¶ 4-7; Ex. 10 [Kam] ¶¶ 5-7; Ex. 11 [Mokris] ¶ 5; Ex. 12 [D. Parker] ¶¶ 4-6; Ex. 13 [M. Parker] ¶¶ 5-6; Ex. 14 [Raulerson] ¶¶ 3-4; Ex. 15 [Rogers] ¶¶ 3, 5; Ex. 16 [Schutz] ¶¶ 4-5; Ex. 17 [Zielinski] ¶¶ 4-6, Att. B.

[21]     Ex. 6 [Bethea] ¶¶ 5, 7-8, Atts. A, E, G; Ex. 7 [Dever] ¶ 9; Ex. 8 [Hendrix] ¶ 6; Ex. 9 [Johnstone]¶ 8; Ex. 10 [Kam] ¶ 8; Ex. 11 [Mokris] ¶ 6; Ex. 12 [D. Parker] ¶ 7; Ex. 13 [M. Parker] ¶ 7; Ex. 14 [Raulerson] ¶ 6; Ex. 15 [Rogers] ¶ 7; Ex. 16 [Schutz] ¶ 6; Ex. 17 [Zielinski] ¶ 7.

[22]     Ex. 6 [Bethea] ¶ 21; Ex. 8 [Hendrix] ¶¶ 17, 20; Ex. 9 [Johnstone] ¶ 19; Ex. 10 [Kam] ¶16; Ex. 11 [Mokris] ¶ 21; Ex. 12 [D. Parker] ¶ 14; Ex. 13 [M. Parker] ¶ 18; Ex. 14 [Raulerson] ¶ 21; Ex. 15 [Rogers] ¶ 17; Ex. 16 [Schutz] ¶¶ 16-17; Ex. 17 [Zielinski] ¶ 19.

[23]     Internet advertising: Ex. 1 [Liggins] ¶ 9; Yellow Pages: Ex. 3 [Stephens] ¶ 15; Ex. 9 [Johnstone] ¶ 3; Ex. 12 [D. Parker] ¶ 4; Signs: Ex. 6 [Bethea] ¶ 4; Ex. 7 [Dever] ¶ 3; Ex. 10 [Kam] ¶ 3; Ex. 17 [Zielinski] ¶ 3; and Radio: Ex. 11 [Mokris] ¶ 3; Ex. 14 [Raulerson] ¶ 3; Ex. 15 [Rogers] ¶ 3.

<u>"THE LEADER IN CREDIT REPAIR"</u>[24]

After clicking on this ad, consumers are linked to another webpage on this site that states:

Nationwide Credit Services, Inc.
\*   \*   \*
**Jamie Dooley (904) 731-1333**
"THE LEADER IN CREDIT REPAIR"
**STOP!**
**PAYING HIGH INTEREST RATES!**
\*   \*   \*
BANKRUPTCIES
REPOSSESIONS [sic]
JUDGEMENTS
CHARGE OFFS
COLLECTION ACCOUNTS
MEDICAL BILLS
SLOW PAY HISTORY
AND MORE. . .
**CAN BE LEGALLY ERASED!**[25]

Similarly, in an ad in the Jacksonville, Florida, Yellow Pages, Defendants made the

following representations to induce consumers to purchase their credit repair services:

Nationwide Credit Services, Inc.
Call Jamie Dooley
*"The Leader in Credit Repair"*
•      Bankruptcies
•      Judgements
•      Slow Pay History
•      Repossessions
•      Collection Accounts
**CAN BE LEGALLY ERASED!**
*"Let Us Help You Repair Your Credit"*[26]

---

[24]      Ex. 1 [Liggins] ¶ 9, Atts. D, E, p.1.

[25]      Ex. 1 [Liggins] ¶ 9, Atts. D, E, p. 2.

[26]      Ex. 3 [Stephens] ¶ 15, Att. C.

When consumers contact NCS, Defendants' representatives reinforce the claims that NCS can permanently remove all negative information from consumers' credit reports.[27] Examples of the types of claims used to induce consumers to purchase Defendants' credit repair services were captured in a recorded telephone call made by an FTC investigator:

> That's exactly what we do.  We get the negative items deleted off of your credit.
>
> \*      \*      \*
>
> We can get anything deleted – from a small to 30-day late pay to as large as a judgment, lien, bankruptcy, foreclosure and just about anything in between.[28]

During the initial contact, consumers are encouraged to make an appointment to review their credit reports with an NCS representative either at NCS's office or by telephone. At this appointment, NCS representatives confirm that the negative credit information can be removed from consumers' credit reports.[29]  Consumers who agree to purchase Defendants' services must pay a $75 to $150 advance fee or "down payment" by cash, check, or bank debit before NCS will begin the credit repair process.  Consumers are told that they must also pay additional monthly fees in the same amount as the down payment while the credit repair services are being performed.[30]

---

[27]    Ex. 6 [Bethea] ¶ 4; Ex. 7 [Dever] ¶ 8; Ex. 8 [Hendrix] ¶ 5; Ex. 10 [Kam] ¶ 5; Ex. 11 [Mokris] ¶ 5; Ex. 12 [D. Parker] ¶ 5; Ex. 15 [Rogers] ¶ 5.

[28]    Ex. 2 [Jackson] Atts. A, B, pp. 4, 8.

[29]    Ex. 7 [Dever] ¶¶ 7-8; Ex. 9 [Johnstone] ¶ 5; Ex. 10 [Kam] ¶ 6; Ex. 12 [D. Parker] ¶ 6; Ex. 13 [M. Parker] ¶ 5; Ex. 14 [Raulerson] ¶ 4; Ex. 16 [Schutz] ¶ 4 ; Ex. 17 [Zielinski] ¶ 5.

[30]    Ex. 6 [Bethea] ¶ 7; Ex. 8 [Hendrix] ¶ 5; Ex. 9 [Johnstone] ¶ 8; Ex. 10 [Kam] ¶ 6; Ex. 11 [Mokris] ¶ 5; Ex. 12 [D. Parker] ¶ 6; Ex. 13 [M. Parker] ¶ 5; Ex. 14 [Raulerson] ¶ 5; Ex. 15 [Rogers] ¶ 6; Ex. 16 [Schutz] ¶ 6; Ex. 17 [Zielinski] ¶ 5.

Those consumers who personally visit an NCS office are usually asked to sign a contract called a "Membership and Service Agreement."[31]  After signing up and paying the down payment, NCS representatives tell consumers: that NCS will order new copies of their credit reports from the credit bureaus, which will be mailed to the consumers; that NCS will challenge the negative information on the reports; and that consumers will, thereafter, receive updated credit reports showing the removal of their negative credit.[32]

Despite NCS's representations, many consumers report that they received nothing in the mail – neither credit reports nor any further contact from NCS regarding the status of their credit repair.[33]  Consumers who later see their credit reports[34] find that virtually all of the negative information that NCS promised to remove is still reported.  Even after paying Defendants hundred of dollars, consumers do not receive the promised results, *i.e.*, Defendants fail to remove current accurate negative information from consumers' credit

---

[31]    Consumers signing a contract (attachments are copies of the contract): Ex. 9 [Johnstone] ¶ 8, Att. B; Ex. 10 [Kam] ¶ 8, Att. A; Ex. 12 [D. Parker] ¶ 7; Ex. 14 [Raulerson] ¶¶ 6, 7, 8, 12; Ex. 16 [Schutz] ¶ 6, Att. C; Ex. 17 [Zielinski] ¶ 7, Att. C.  Consumers not signing a contract: Ex. 6 [Bethea] ¶¶ 8, 21; Ex. 8 [Hendrix] ¶ 6; Ex. 11 [Mokris] ¶¶ 6,9, 17; Ex. 13 [M. Parker] ¶¶ 7; Ex. 15 [Rogers] ¶ 7.  Consumers who dealt with NCS via telephone, typically did not sign a contract:  Ex. 7 [Dever] ¶ 9.

[32]    Ex. 6 [Bethea] ¶ 8; Ex. 8 [Hendrix] ¶ 6; Ex. 11 [Mokris] ¶ 5; Ex. 12 [D. Parker] ¶ 6; Ex. 13 [M. Parker] ¶ 7; Ex. 14 [Raulerson] ¶ 6; Ex. 16 [Schutz] ¶ 6; Ex. 17 [Zielinski] ¶ 5.

[33]    Ex. 6 [Bethea] ¶¶ 10-13; Ex. 7 [Dever] ¶ 10; Ex. 8 [Hendrix] ¶¶ 7, 8; Ex. 10 [Kam] ¶¶ 9-11; Ex. 11 [Mokris] ¶¶ 7, 8, 14, 21; Ex. 14 [Raulerson] ¶¶ 7, 9, 11, 19; Ex. 17 [Zielinski] ¶¶ 8, 9, 11, 12.

[34]    Some consumers, who do not receive credit reports ordered by NCS, order their own credit reports to determine what, if any, work has been done by NCS to delete their negative credit. Ex. 8 [Hendrix] ¶ 18; Ex. 10 [Kam] ¶ 11; Ex. 11 [Mokris] ¶ 21; Ex. 14 [Raulerson] ¶ 10; Ex. 15 [Rogers] ¶ 14; Ex. 17 [Zielinski] ¶ 12.

reports.[35]

Dissatisfied consumers find that their complaints to NCS produce no results.[36] Consumers attempting to terminate the service or cancel their contract find it difficult to do so. Consumers who provide written notice to Defendants to cancel, often find their cancellation requests ignored and that Defendants continue to debit monthly fees from the consumers' bank accounts.[37] In some instances, NCS representatives have threatened consumers with law suits and/or more negative credit if the consumers did not continue to pay NCS's fees.[38] Consumers' requests for refunds are almost always denied by Defendants. Even consumers who file complaints against Defendants with the BBB are typically unsuccessful in getting a response or a refund of their money.[39]

## V.     THE COURT HAS THE AUTHORITY TO GRANT THE RELIEF REQUESTED

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to bring suit in

---

[35]      Ex. 6 [Bethea] ¶ 21; Ex. 8 [Hendrix] ¶¶ 18, 20; Ex. 9 [Johnstone] ¶ 19; Ex. 10 [Kam] ¶16; Ex. 11 [Mokris] ¶¶ 11, 12, 13, 14, 21; Ex. 12 [D. Parker] ¶ 14; Ex. 13 [M. Parker] ¶ 18; Ex. 14 [Raulerson] ¶ 21; Ex. 15 [Rogers] ¶ 17; Ex. 16 [Schutz] ¶ 17; Ex. 17 [Zielinski] ¶ 19.

[36]      Ex. 6 [Bethea] ¶¶ 12-20; Ex. 7 [Dever] ¶ 10; Ex. 8 [Hendrix] ¶ 13; Ex. 9 [Johnstone] ¶ 13; Ex. 10 [Kam] ¶¶ 10; Ex. 12 [D. Parker] ¶¶ 9, 11; Ex. 13 [M. Parker] ¶ 17; Ex. 14 [Raulerson] ¶¶ 11, 14; Ex. 16 [Schutz] ¶ 13.

[37]      Ex. 7 [Dever] ¶¶ 10; Ex. 8 [Hendrix] ¶¶ 8-15 ; Ex. 9 [Johnstone] ¶¶ 11-17; Ex. 10 [Kam] ¶¶ 12-14; Ex. 11 [Mokris] ¶¶ 8-16, 18-19; Ex. 12 [D. Parker] ¶¶ 10, 11; Ex. 13 [M. Parker] ¶¶ 8-17 ; Ex. 14 [Raulerson] ¶¶ 11-21; Ex. 15 [Rogers] ¶¶ 9-16; Ex. 16 [Schutz] ¶¶ 8-14; Ex. 17 [Zielinski] ¶¶ 14-16.

[38]      Ex. 8 [Hendrix] ¶¶ 11, 13; Ex. 9 [Johnstone] ¶ 16; Ex. 13 [M. Parker] ¶ 13; Ex. 14 [Raulerson] ¶ 13; Ex. 16 [Schutz] ¶ 12; Ex. 17 [Zielinski] ¶ 13.

[39]      Ex. 3 [Stephens] ¶ 11; Ex. 6 [Bethea] ¶¶ 12-20; Ex. 7 [Dever] ¶ 10; Ex. 8 [Hendrix] ¶¶ 11, 14; Ex. 9 [Johnstone] ¶ 18; Ex. 10 [Kam] ¶ 15; Ex. 11 [Mokris] ¶¶ 11, 13, 17, 21; Ex. 12 [D. Parker] ¶¶ 12, 14; Ex. 13 [M. Parker] ¶¶ 14, 16-18; Ex. 14 [Raulerson] ¶¶ 14, 18, 21; Ex. 15 [Rogers] ¶ 12; Ex. 16 [Schutz] ¶ 14; Ex. 17 [Zielinski] ¶ 17.

federal district court whenever it has reason to believe that a party is violating, or is about to violate, any provision of the law enforced by the FTC and that enjoining such conduct is in the public interest.[40]  The second proviso of Section 13(b), under which this action is brought, provides that, "in proper cases the FTC may seek and, after proper proof, the court may issue a permanent injunction." It is this proviso that gives the FTC authority to bring a permanent injunction action in district court.[41]  By permitting the FTC to bring a permanent injunction action, Congress also gave the district court power to order whatever preliminary relief may be needed to make permanent relief possible, including preliminary injunctions, temporary restraining orders, and other relief.[42]

 Courts have consistently held that it is appropriate to invoke the remedies of Section 13(b) in cases where there is routine fraud or a straightforward deceptive practice.  The second proviso of Section 13(b) empowers courts to exercise the full breadth of their equitable authority:

> Congress, when it gave the district court authority to grant a permanent injunction against violations of any provisions of law enforced by the Commission, also gave the district court authority to grant any ancillary

---

[40] A copy of § 13(b) is contained in Vol. III, Tab A, filed herewith. Section 13(b) consists of two distinct parts. The first portion of the statute, through and including the first proviso, is concerned with provisional injunctive relief in aid of an administrative complaint. This portion of 13(b), which is inapplicable to the current action, gives authority for the issuance of temporary restraining orders and preliminary injunctions after a proper showing by the FTC and notice to the defendants. The instant action is brought under the second portion of § 13(b), which concerns actions for permanent injunction.

[41] *See FTC v. Gem Merchandising Corp.,* 87 F. 3d 466, 469 (11th Cir. 1996); *FTC v. U.S. Oil & Gas Corp.,* 748 F. 2d 1431, 1432-34 (11th Cir. 1984); *FTC v. H. N. Singer, Inc.,* 668 F. 2d 1107, 1110-12 (9th Cir. 1982).

[42] *U.S. Oil & Gas,* 748 F. 2d at 1434 (*quoting Singer,* 668 F. 2d at 1113); *see also FTC v. Elders Grain, Inc.,* 868 F. 2d 901, 907 (7th Cir. 1989); *FTC v. Amy Travel Serv., Inc.,* 875 F. 2d 564, 571-2 (7th Cir. 1989).

relief necessary to accomplish complete justice because it did not limit
that traditional equitable power explicitly or by necessary and
inescapable inference.[43]

The Court's inherent equitable powers may be used to issue a TRO and preliminary
injunction, including an asset freeze, during the pendency of an action for permanent
injunctive relief.[44]  To bring an immediate halt to unlawful, injurious trade practices and to
preserve the availability of effective final relief, the district court may issue a TRO as part of
its inherent equitable authority.[45]

The instant case clearly qualifies as a "proper case" under the second proviso of
Section 13(b).  Where, as here, there is evidence of straightforward deceptive practices or
routine fraud, courts have consistently held that the remedies of Section 13(b) are
warranted.[46]  Courts have applied the remedies of Section 13(b) to these types of "proper
cases" for permanent injunction by granting the FTC's requests for TROs and other forms of
ancillary relief.[47]

---

[43]     *U.S. Oil & Gas*, 748 F. 2d at 1434 (*quoting Singer*, 668 F. 2d at 1113); *see also Gem Merchandising Corp.*, 87 F. 3d at 469; *FTC v. Amy Travel Serv.*, 875 F. 2d at 571-2; *FTC v. Southwest Sunsites*, 665 F. 2d 711, 718-19 (5th Cir. 1982).

[44]     *U.S. Oil & Gas*, 748 F. 2d at 1434.

[45]     *In re Vuitton et Fils S.A.*, 606 F. 2d 1, 3-4 (2d Cir. 1979).

[46]     *FTC v. World Travel Vacation Brokers*, 861 F. 2d 1020, 1026-28 (7th Cir. 1988).

[47]     Recent TROs issued in the Middle District of Florida include: *FTC v. United Home Savers, LLP*, No. 8:08-cv-1735-T-33TBM (M.D. Fla. Sept. 4, 2008); *FTC v. Mortgage Foreclosure Solutions*, No. 8:08-cv-00388-T-23EAJ (M.D. Fla. Feb. 27, 2008); *FTC v. FTN Promotions, Inc.*, No. 8:07-cv-1279-T-3OTGW (M.D. Fla. July 23, 2007); *FTC v. Global Mktg. Group, Inc.*, No. 8:06-cv-2272-30TGW (M.D. Fla. Dec. 12, 2006); *FTC v. Gregory Bryant, Jr.*, No. 3:04-cv-897-J-32MMH (M.D. Fla. Sept. 16, 2004); *FTC v. Thomas Gregg Holloway*, No. 3:02-cv-343-J20TEM (M.D. Fla. Apr. 12, 2002).  Recent TROs issued in CROA cases include:  *FTC v. Rudolph Joseph Strobel*, No. 2:08-CV-326 (E.D. Tex. Aug. 28, 2008); *FTC v. Payneless Credit Repair, LLC*, No.3:08-cv-1160-M (N.D. Tex. July 10, 2008); *FTC v. Bad Credit Be Gone*, No. 1:06-cv-00254 (E.D. Ill. Jan. 2006); *FTC v. Debt Management Foundation Services,* No. 8:04-cv-1674-T-17MSS (M.D. Fla.

## VI.  ENTRY OF A TRO AND PRELIMINARY INJUNCTION IS APPROPRIATE

The FTC has submitted overwhelming evidence in support of its motion that clearly demonstrates Defendants' fraudulent and deceptive credit repair scheme.  Section 13(b) of the FTC Act was designed to combat such abuses.  For an agency that acts as a "statutory guardian charged with safeguarding the public interest," the standard for awarding preliminary injunctive relief is lower than that applied to private litigants.[48]  When the government moves for a preliminary injunction to enforce a federal statute, the court is not required to consider the same factors as it would in a motion for injunctive relief submitted by private litigants.[49]  In a Section 13(b) action, courts need only consider two factors in determining whether to grant preliminary injunctive relief:  (1) the likelihood of success on the merits and (2) the balance of equities.[50]  Irreparable injury need not be shown.[51]  Moreover, harm to the public interest is presumed in a statutory enforcement action.[52]

Finally, when demonstrating its "likelihood of ultimate success," the FTC is not required to show a strong probability of success, although the evidence presented in this

---

July 20, 2004).  All of the above TROs can be found in Vol. III, filed herewith.

[48]    *SEC v. Mgmt. Dynamics, Inc.*, 515 F. 2d 801, 808 (2d Cir. 1975).

[49]    *U.S. v. Odessa Union Warehouse Co-op*, 833 F. 2d 172, 174-75 (9th Cir. 1987); *see also FTC v. World Wide Factors, Ltd.*, 882 F. 2d 344, 346-47 (9th Cir. 1989).

[50]    *FTC v. Affordable Media, L.L.C.*, 179 F. 3d 1228, 1233 (9th Cir. 1999) (quoting *FTC v. Warner Communs., Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984); *World Travel Vacation Brokers*, 861 F. 2d at 1029; *FTC v. World Wide Factors, Ltd.*, 882 F. 2d 344, 346-347 (9th Cir. 1989); *FTC v. Para-Link Int'l, Inc.*, 2000 U.S. Dist. LEXIS 21509 at * 7 (M.D. Fla. Nov. 21, 2000).

[51]    *World Travel Vacation Brokers*, 861 F. 2d at 1029; *see also Gresham v. Windrush Partners, Ltd.*, 730 F. 2d 1417 at 1423 (11th Cir. 1984).

[52]    *See World Wide Factors*, 882 F. 2d at 346; *Warner Communications*, 742 F. 2d at 1159.

matter does make such a showing.  Rather, because irreparable injury is presumed in a statutory enforcement action, the FTC need only show that it has "some chance of probable success on the merits."[53]

## A.    The FTC Has Demonstrated a Likelihood of Success on the Merits

The evidence submitted, including Defendants' advertising and promotional materials, declarations from consumers and a former NCS employee, declarations from the President of the Northeast Florida BBB and two credit reporting agencies, consumer complaints to the BBB and FTC, and an undercover sales call transcript, clearly demonstrates a substantial likelihood that the FTC will succeed in establishing that the Defendants' credit repair scheme violates Section 5 of the FTC Act and CROA.

### 1.    Defendants have violated Section 5 of the FTC Act  (Count III)

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), provides:  "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."  To prove deception under Section 5(a), the FTC must demonstrate that: (1) there is a representation, omission, or practice; (2) that is likely to mislead consumers acting reasonably under the circumstances; and (3) that the representation, omission, or practice is material.[54]  False claims are inherently "likely to

---

[53]    *World Wide Factors*, 882 F. 2d at 347; *Odessa Union Warehouse Co-op*, 833 F. 2d at 176.

[54]    *FTC v. Gill*, 265 F. 3d 944, 950 (9th Cir. 2001*); FTC v. Pantron I Corp.*, 33 F. 3d 1088, 1095 (9th Cir. 1994) (*citing In re Cliffdale Assoc., Inc.*, 103 F.T.C. 110, 165 (1984)).

mislead."[55]  Express claims, or deliberately-made claims, used to induce the purchase of a

particular product or service are presumed to be material.[56]  A "material" misrepresentation

or practice is one which is likely to affect a consumer's choice of or conduct regarding a

product or service.[57]  The evidence submitted in support of the Plaintiff's Motion for a TRO

is more than sufficient to prove that Defendants have violated Section 5 of the FTC Act.

 As described above in Part IV, Defendants' business is premised on false

representations that mislead consumers.  Defendants falsely represent in their advertising and

oral representations that they can that they can improve substantially consumers' credit by

permanently removing negative information from consumers' credit reports, even where

such information is current and accurate.  These false representations are clearly material.

Consumers consistently state that they purchased the Defendants' credit repair services

because they were misled by Defendants' false representations, and that, had they known

Defendants would not perform as promised, they would not have purchased Defendants'

services.[58]  Moreover, the declarations from two credit reporting agencies – TransUnion LLC

and Experian Information Solutions, Inc. – attest to the fact that the process Defendants use

to dispute information on consumers' credit reports will not result in the removal of negative

---

[55] *In re Thompson Med. Co.*, 104 F.T.C. 648, 788, 818-19 (1984), *aff'd*, 791 F. 2d 189 (D.C. Cir. 1986).

[56] *Thompson Med. Co.*, 104 F.T.C. at 816.

[57] *Kraft, Inc. v. FTC*, 970 F. 2d 311, 322 (7th Cir. 1992).

[58] Ex. 6 [Bethea] ¶¶ 8, 21; Ex. 8 [Hendrix] ¶¶ 6, 20; Ex. 9 [Johnstone] ¶¶ 7, 19; Ex. 10 [Kam] ¶¶ 7, 16; Ex. 11 [Mokris] ¶¶ 6, 21 ; Ex. 12 [D. Parker] ¶¶ 7, 14 ; Ex. 13 [M. Parker] ¶¶ 6,18; Ex. 14 [Raulerson] ¶¶6, 21; Ex. 15 [Rogers] ¶¶ 7, 17; Ex. 16 [Schutz] ¶¶ 6, 17; Ex. 17 [Zielinski] ¶ 6, 19.

information that is current and accurate.[59]  Since consumers relied, to their detriment, on

Defendants' patently false representations in their decision to purchase Defendants' services,

Defendants have, accordingly, violated Section 5 of the FTC Act.

> 2.    **Defendants have violated the Credit Repair Organizations Act  (Count I and Count II)**

Section 410(b) of CROA, 15 U.S.C. § 1679h(b), states in part:

> [A]ny violation of any requirement or prohibition imposed under [CROA]
> with respect to credit repair organizations shall constitute an unfair or
> deceptive act or practice in commerce in violation of section 5(a) of the
> Federal Trade Commission Act. . . . All functions and powers of the Federal
> Trade Commission under the Federal Trade Commission Act shall be
> available to the Commission to enforce compliance with [CROA] by any
> person subject to enforcement by the Federal Trade Commission pursuant to
> this subsection[.]

Defendants' business practices violate two provisions of CROA.  First, Section

404(a)(3) of CROA, 15 U.S.C. § 1679b(a)(3), provides that: "No person may . . . make or use

any untrue or misleading representation of the services of the credit repair organization[.]"

As described above, in detail, in Part IV, Defendants falsely claim that they can permanently

remove negative information that is accurate and not obsolete from consumers' credit

reports. As borne out from the consumer declarations, consumer complaints and the

declarations of the two credit reporting agencies, Defendants do not and legally cannot

permanently remove current accurate negative information on credit reports.  Therefore, this

claim violates Section 404(a)(3) of CROA, 15 U.S.C. § 1679b(a)(3).

Second, Defendants violate Section 404(b) of CROA, 15 U.S.C. § 1679b(b), which

---

[59]    Ex. 4 [TransUnion] ¶¶ 10-13; Ex. 5 [Experian] ¶¶ 14-20.

provides that "no credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." As stated above in Part IV, Defendants routinely charge consumers a $75 to $150 down payment for credit repair services, before any such services have been fully performed.[60] Defendants' practice of charging consumers payment up-front is a blatant violation of this provision of CROA.

### B.    The Balance of Equities Mandates Temporary and Preliminary Relief

The balance of equities mandates temporary and preliminary relief in this case. Where, as here, public and private equities are at issue, public equities far outweigh private equities.[61] This is particularly true in the instant case, since Defendants "can have no vested interest in a business activity found to be illegal."[62] Further, the need for injunctive relief is especially acute where it may prevent significant injury, as is true in this case.[63]

Defendants' past conduct "gives rise to the inference that there is a reasonable likelihood of future violations" of the FTC Act.[64] Defendants have systematically deceived

---

[60]    *See infra* note 21.  In fact, NCS's contract expressly states that consumers pay an advance fee called alternatively a "down payment" or "membership fee."  Ex. 9 [Johnstone] Att. B, pp. 1, 4; Ex. 10 [Kam] Att. A, pp. 1, 4; Ex. 16 [Schutz] Att. C, pp. 1, 4; Ex. 17 [Zielinski] Att. C, pp. 1, 4.

[61]    *World Wide Factors*, 882 F. 2d at 347.

[62]    *U.S. v. Diapulse Corp. of Am.*, 457 F. 2d 25, 29 (2d Cir. 1972).

[63]    *World Travel Vacation Brokers*, 861 F. 2d at 1330-31.

[64]    *See SEC v. R. J. Allen & Assoc., Inc.*, 386 F. Supp. 866, 877 (S.D. Fla. 1974); *CFTC v. Hunt*, 591 F. 2d 1211, 1220 (7th Cir. 1979) ("Once a violation is demonstrated, the moving party need only show that there is some reasonable likelihood of future violations").

consumers since 2004 and their scheme continues unabated, despite notification more than

four years ago by the BBB of consumers complaints regarding their business practices.[65]

Defendants' blatant violations indicate a reasonable likelihood of future violations. When

enacting Section 13(b), Congress intended to serve the public interest by protecting victims

from the effects of deceptive trade practices "as quickly as possible."[66] By temporarily and

preliminarily enjoining Defendants' illegal practices, this Court will effectuate the intent of

Congress in enacting Section 13(b).

## VII.    DEFENDANT JAMES R. DOOLEY IS INDIVIDUALLY LIABLE

An individual defendant is liable for a corporate defendant's violations when: (1) the

corporate defendant violates the FTC Act; (2) the individual defendant has authority to

control the corporate defendant or participates directly in the wrongful acts or practices; and

(3) the individual defendant has some knowledge of the wrongful acts or practices.[67]

Defendant Dooley is individually liable under this standard because he has authority to

control NCS, the corporate Defendant, he participates in the wrongful acts and practices, and

---

[65]    The BBB has forwarded complaints to Defendants' since opening a file on NCS on June 10, 2004.  Ex. 3 [Stephens] ¶ 7.

[66]    *World Travel Vacation Brokers*, 861 F. 2d at 1028; *see also  FTC v. Southwest Sunsites, Inc.*, 665 F. 2d 711, 719 (5th Cir. 1982).

[67]    *Gem Merch. Corp.*, 87 F. 3d 466 at 470 (11th Cir. 1996); *Amy Travel Serv.*, 875 F.2d 564 at 573; *Jordan Ashley*, 1994-1 Trade Cas. (CCH) at ¶ 72,096. To satisfy the knowledge requirement, the Commission "need not demonstrate . . . that the individual defendants possessed the intent to defraud." *FTC v. Jordan Ashley*, 1994-1 Trade Cas. (CCH) ¶ 70,570, 72,096 (S.D. Fla. 1994) (citing *FTC v. Amy Travel Service*, 875 F. 2d 564, 573-74 (7th Cir.), *cert. denied*, 493 U.S. 594 (1989)). Nor must the Commission demonstrate that defendants had actual knowledge of the misrepresentations – reckless indifference to the truth or falsity of the representations or an awareness of a high probability of fraud coupled with an intentional avoidance of the truth will suffice. *FTC v. Atlantex Assoc.*, 1987-2 Trade Cas. (CCH) ¶ 67, 788, 69,253 (S.D. Fla. 1987), *aff'd* 872 F. 2d 966 (11th Cir. 1989); and *FTC v. Kitco of Nev.*, 612 F. Supp. 1282, 1292 (8th Cir. 1985).

has knowledge of the wrongful acts and practices of NCS.

Dooley, as the president of NCS, a closely-held company,[68] directs and controls every aspect of the business operations of NCS.  He hires, trains, and supervises the employees at NCS and sets the policies and practices for the company.[69]  He opened and has been a signatory on the company's bank accounts, and signs the checks for NCS, including the few refund checks issued to complaining consumers.[70]  Dooley signed the leases for NCS's current and former business offices and signs the monthly rental checks.  He deals directly with the landlord concerning the maintenance, signage, and utilities for the NCS offices.  The insurance policy on NCS's Jacksonville offices was issued to Dooley.[71]  He has ordered advertising signs for the various NCS offices located in Georgia and Florida.[72]  Further, as shown above in Part IV, NCS's advertisements direct consumers to call "Jamie Dooley."[73]

Dooley has an in-depth knowledge of the deceptive practices of NCS.  He was repeatedly informed of the numerous consumer complaints.[74]  In addition, he spoke to at least

---

[68]    Regina "Gina" Dooley is the only other officer of NCS. Ex. 1 [Liggins] ¶ 6, Att. A. "A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception." *Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973).

[69]    Ex. 7 [Dever] ¶¶ 4, 5, 8.

[70]    Ex. 1 [Liggins] ¶¶ 14, 16.M; Ex. 7 [Dever] ¶¶ 4, 11; Ex. 8 [Hendrix] Att. G.

[71]    Ex. 1 [Liggins] ¶16.

[72]    Ex. 7 [Dever] ¶¶ 3-4.

[73]    Ex. 1 [Liggins] Atts. D, E; Ex. 3 [Stephens] Att. C.

[74]    Ex. 3 [Stephens] ¶11, Att. B, p. 100; Ex. 7 [Dever] ¶¶ 5, 10, 11; Ex. 6 [Bethea] ¶ 17;  8.

two consumers directly about their complaints against NCS,[75] and settled a lawsuit filed

against him and NCS by another consumer.[76]  Consequently, Dooley is individually liable for

the violations of the corporate Defendant, NCS.

## VIII.   A TRO INCLUDING INJUNCTIVE RELIEF, AN ASSET FREEZE, AND IMMEDIATE PRODUCTION OF DOCUMENTS IS NECESSARY

Defendants' business is purely fraudulent – based on deception, false promises, and

misrepresentations – and their deceptive practices should be immediately halted.  The

injunctive relief sought by the FTC simply orders Defendants to obey Section 5(a) of the

FTC Act and CROA.  This relief would serve the public interest by stopping the long-

standing deceptive scheme perpetrated by Defendants and preventing further harm to the

public.  In addition to injunctive relief, the FTC asks this Court to freeze Defendants' assets

and require Defendants to immediately produce certain documents and information.  The

FTC seeks to redress injury to consumers as a part of the final relief in this case.  To ensure

the possibility of such relief, an asset freeze is designed to preserve the *status quo*.

A freeze of the individual and the corporate defendants' assets is essential in this

instance to prevent the dissipation of assets during the pendency of litigation.[77]  An asset

freeze is a proper equitable remedy to assure the availability of permanent relief.[78]  "The

---

[75]     Ex. 3 [Stephens] Att. B, p. 100; Ex. 8 [Hendrix] ¶ 17.

[76]     Ex. 16 [Schutz] Atts. L, M.

[77]     *See Singer*, 668 F. 2d at 1113 (asset freeze appropriate when FTC objective is "to obtain restitution of monies fraudulently obtained").

[78]     *Gem Merch. Corp.*, 87 F. 3d at 469; *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F. 3d 982, 987 (11th Cir. 1995); *U.S. Oil & Gas*, 748 F. 2d at 1434; *see Singer*, 668 F. 2d at 1113 (asset freeze appropriate when FTC objective is "to obtain restitution of monies fraudulently obtained").

power of a district court to issue a 'freeze order' in a §13(b) action is well established . . . ."[79]
In fact, a court may impose an asset freeze based on the mere possibility of dissipation of
assets.[80]  Defendants' pervasive and ongoing deception demonstrates their willingness to
engage in wrongdoing.  The possibility of a monetary judgment depriving Defendants of the
fruits of their illicit labor provides Defendants with ample incentive to conceal or dissipate
otherwise recoverable assets.

The FTC also asks this Court to require Defendants to immediately produce certain
business records, including, but not limited to, consumer complaints, customer lists, and
detailed financial information.  Such production is necessary to quickly determine:  (1) the
full scope of Defendants' law violations, (2) the identities of injured consumers, (3) the total
amount of consumer injury, and (4) the nature, extent, and location of Defendants' assets.

---

[79]    *Gem Merch. Corp.*, 87 F. 3d 466 at 469.

[80]    *Fed. Sav. & Loan Ins. Corp. v. Sahni*, 868 F. 2d 1096, 1097 (9th Cir. 1989); *see also USA Bevs, Inc.*, 2005 U.S. Dist. LEXIS 39075 at *26.

Page 21 of  22

## X.    CONCLUSION

For the foregoing reasons, the FTC respectfully seeks this Court to issue the

requested temporary restraining order.

Dated: 10/20, 2008                              Respectfully submitted,

WILLIAM BLUMENTHAL
General Counsel

BRADLEY M. ELBEIN
Regional Director

BARBARA E. BOLTON, Trial Counsel
Special Florida Bar No. A5500848
FEDERAL TRADE COMMISSION
Southeast Regional Office
225 Peachtree Street, Suite 1500
Atlanta, Georgia 30303
Tel:  (404) 656-1362 (Bolton)
Fax:  (404) 656-1379
Email:  bbolton@ftc.gov

**ATTORNEYS FOR PLAINTIFF**